*Bruno v. Zilvitis*, No. 205-4-11 Wrcv (Teachout, J., October 1, 2014)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Windsor Unit** | **Docket #205-4-11 Wrcv** |

**WILLIAM S. BRUNO and**
**PAMELA J. BRUNO**

       **v.**

**PATRICK J. ZILVITIS and**
**JUDY J. ZILVITIS, as Individuals and as**
**Trustees of the ZILVITIS REALTY TRUST, and**
**PATRICK J. ZILVITIS as**
**Trustee of THE PATRICK J. ZILVITIS QPRT, and**
**JUDY J. ZILVITIS as**
**Trustee of THE JUDY J. ZILVITIS QPRT**

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Plaintiffs and Defendants own neighboring waterfront homes on Round Pond in the Town of Ludlow which they have used as vacation homes, primarily for skiing, for many years. Plaintiffs rebuilt their house and changed their property in 2005 in preparation for living there full time in retirement. In doing so, they moved and reconstructed the house and changed the access route for entering their property from Norman Drive, which crossed the Defendants' property before ending at the Plaintiffs' property line, to a different location, on Tepper Drive, which does not affect Defendants' property. After the access route was changed, Defendants closed off Norman Drive and built a fence across it where the Plaintiffs previously entered their property. Plaintiffs seek a declaration that they have a continuing legal right to use Norman Drive and they seek an injunction restraining Defendants from maintaining the fence or any obstructions. Defendants claim Plaintiffs have no present legal right to cross Defendants' property on Norman Drive to reach Plaintiffs' reconfigured property.

Plaintiffs originally claimed that they owned a right of way across Norman Drive created by deed. In a Decision of December 31, 2012 on a Motion for Summary Judgment, this Court (J. Eaton presiding) ruled that Plaintiffs have no deeded right of way over Norman Drive, but left for final hearing the issue of whether Plaintiffs have a right based on a prescriptive easement. Defendants claim

that Plaintiffs' prior use of Norman Drive was based on a right created by necessity and that it has since terminated, and that they have no present right.

A site visit was made prior to the evidentiary final hearing. The final hearing on the merits was held on June 19 and 20 and July 7, 2014. Amended Proposed Findings of Fact and Conclusions of Law were filed thereafter. Plaintiffs are represented by Attorneys George T. McNaughton and Travis W. Weaver. Defendants are represented by Attorneys Amanda T. Rundle and Christopher M. Rundle.

Based on the credible evidence, the Court makes the following Findings of Fact and Conclusions of Law.

## Findings of Fact

Just prior to June of 1946, a large tract of land on the east side of Round Pond was owned by the Ludlow Electric Shop, Inc. (LESI). On June 15th, LESI conveyed two adjacent waterfront lots, one to Buxton, which later became the southern half of the property now owned by Plaintiffs, and the other to Hodge, which later became the northern half of the property now owned by Defendants. See Attachment 1. For both properties, the eastern boundary was described as a "proposed roadway." No road yet existed at that location, although it is likely that there was a path or old logging road. Neither deed included a right of access across such "proposed roadway," which later became called Tepper Drive. In fact, neither deed included any right of access across surrounding land, which continued to be owned by LESI.

The nearest road that was maintained as a Town road was to the south and was called Round Pond Road. It was the only public access to any of the properties in the vicinity. It is not known whether any physical road or path or route of any kind was in existence on the ground from either of the conveyed lots across LESI land to the south to join with Round Pond Road. In January of 1948, LESI conveyed all its remaining land in the vicinity to Lael Sargent.

On July 9, 1952, the Buxton lot was conveyed to Rand. By this time, there was a cottage on the Buxton lot, which Rand acquired. Rand did not acquire any legal right of access from Round Pond Road across intervening land (Lael Sargent and Hodge) to the conveyed cottage parcel. It is reasonable to infer, from the existence of the cottage, that by the time of this conveyance, the single lane gravel road later called Norman Drive was in existence to provide physical access from Round Pond Road to the cottage. The "proposed roadway" as described in the 1946 deeds that later became Tepper Drive did not yet exist as a roadway. On both the Rand and Hodge parcels, between the pond to the west and the location of the "proposed roadway" to the east there was a substantial gravel ridge or hill that ran north and south and would have made access to the "proposed roadway" (which was later used for a number of other properties to the north and south) extremely difficult. The Rand cottage was close to the shore, between the pond and the hill. See Attachment 2.

2

In April of 1953, Hodge conveyed her lot, which by then had a cottage on it, to Waldo. Because of the layout of the lot and the hill, it is reasonable to infer that physical access to the Hodge/Waldo cottage was over what was later called Norman Drive, although Waldo did not acquire any legal right of access to connect the Waldo lot with Round Pond Road. In the deed, the eastern boundary was described as the "proposed roadway," suggesting that there was still no physical road on what later became Tepper Drive. One month later, on May 20, 1953, Lael Sargent conveyed to Waldo an adjoining lot to the south of the Waldo cottage lot. In this conveyance, there is no mention of any right of access, and no mention of the roadway later called "Norman Drive," although it was apparently being used as the means of physical access to both the Rand and Waldo cottages. Attachment 3 depicts the two conveyances to Waldo.

On July 15, 1953, less than two months later, Lael Sargent conveyed to Rand an adjoining lot to the north of the Rand cottage lot. This conveyance included a right of way, together with others, over "the roadway" along the eastern boundary of the conveyed parcel (what is now Tepper Drive). See Attachment 4. Lael Sargent owned the underlying land on the roadway. Testimony of Doris Eddy established that there was at least some kind of lane along the "the roadway" which she walked on in 1953 to get to a meadow to the north. Mr. Moss, who built a small dwelling on "the roadway" in 1964 to the north of the subject properties, described it as an old logging road, which could be driven on, though not in the winter.

Thus, as of July 15, 1953, Rand had merged two lots, one of which had a legal right of way over "the roadway" that developed into Tepper Drive. However, the access that was used to get to the Rand cottage was not off Tepper Drive. Physical access was across Norman Drive from Round Pond Road to the Rand property, even though there was no legal right for such access. Similarly, Waldo had merged two lots, but there was no legal right of access for either portion of the merged property; physical access was across Norman Drive from Round Pond Road to the Waldo property.

Nine days after the conveyance to Rand of the northerly portion of the Rand property, on July 24, 1953, Lael Sargent executed warranty deeds in which she purported to convey to both Rand and Waldo easements to use Norman Drive to access their properties, to be used in common with each other. At the time she did this, she actually no longer had any legal interest in the property she purported to convey, having previously divested herself of all interest in it. Rand continued to have a legal right to use Tepper Drive, but did not do so. See Attachment 5.

All access to the Rand property was over Norman Drive, crossing the Waldo (now Zilvitis) property. At that time, Norman Drive was a single lane gravel driveway from Round Pond Road to the Rand cottage, and it ran through the Waldo property. Tepper Drive (not yet called that) was narrow and may or may not have been driveable year round. In any event, there was no way over the hill on the Rand

3

property between 'Tepper Drive' and the Rand cottage.  Doris Eddy and her parents used Norman Drive to visit the Rands on a regular basis for several years beginning in 1953, and there was no other access route other than on Norman Drive.  Beginning in 1964, Frederick Moss used Norman Drive to visit the Beans, who were friends of his and by then owners of the Rand cottage, and he saw the Beans use Norman Drive as the only means of access to their cottage.  This pattern later continued with the next owners of the Rand cottage, who were also friends of his.

In 1976, Plaintiffs, the Brunos, purchased the (former) Rand property.  The property consisted of the cottage on the parcel created in 1953 by merging two lots.  The access was on Norman Drive.  Use of Norman Drive to access the property was historic and appeared to have been conveyed by Lael Sargent's July 24, 1953 deed, which was actually ineffective as a matter of law but was the apparent basis for a right of access over Norman Drive.  The property interests they purchased included a legal right of way to access the land over Tepper Drive, but this easement was unused at that time as there was no physical driveway on the property running over the hill from the cottage to Tepper Drive.

When the Brunos purchased, their address was 23 Norman Drive, and the postal service required them to have their mailbox on Norman Drive.  The only road leading to this area, Ellison Lake Road, formerly known as Round Pond Road, came from the south and continued onto Norman Drive.  Ellison Lake Road was maintained by the Town and there is no evidence that it was not a town road.  The town plowed Norman Drive to a point of turnaround just south of the Bruno property on what is now the Zilvitis property.  When the Brunos came to ski, they were usually able to get their car to push through the snow at the end of the plowed Norman Drive and onto their own land.  Sometimes, if the snow pile was too deep, they parked at the end of the plowed portion of Norman Drive on what is now the Zilvitis property.  When there was no snow on the ground, they drove onto their property and their internal driveway led to the left and downhill to a parking area next to their cottage and close to the pond.  Occasionally, if the snow was deep, they drove past Norman Drive and parked on the side of Tepper Drive adjacent to their land and walked over the hill to their cottage.

In 1983, the Defendants, the Zilvitises, purchased the former Waldo cottage to the south of the Brunos.[1]  They also accessed their cottage via Norman Drive.  At some point, the Zilvitises asked the Brunos not to park on the Zilvitis property any more, and the Brunos complied with the request.  For a short period of time, the

---

[1] The Zilvitises currently own all of the former Waldo property, having reassembled the subparcels that made up the Waldo double lot.  Title to the various parcels has been in the names of different persons and entities over time.  The details are not pertinent to the issues in this case, so for the sake of simplicity the Court refers herein to the "Zilvitises" collectively as owners of land parcels previously owned by Waldo.

Zilvitises requested that the Brunos contribute to road maintenance costs on Norman Drive, and the Brunos did so.

In 1985, the Zilvitises put in a new septic system. They asked the town not to bring the plow truck on their land anymore so as not to drive over the septic area. Thereafter the town plowed to the Y south of the Zilvitis land where, coming from the south, Ellison Lake Road ends in a Y with Norman Drive going to the left and Tepper Drive going to the right. Thereafter the Normans, the Zilvitises, and the Brunos each made separate arrangements to have their portions of Norman Drive plowed. The Brunos had their internal driveway plowed from where Norman Drive entered their property down hill to the left to the parking area next to the cottage.

From the time they purchased, the Brunos never asked anyone for permission to use Norman Drive, and no one ever gave them permission. They believed their use of Norman Drive to be a matter of legal right. Neither the Zilvitises nor any other owner to the south on Norman Drive ever gave the Brunos permission to use Norman Drive, or questioned the right of the Brunos to use Norman Drive to access their property.

In 2004, the Brunos began to plan to make changes to their property in preparation for moving to it to live full time in retirement. They had plans prepared to rebuild the house further back from the pond, which would necessarily result in a reconfiguration of their internal driveway within their property lines. The extent of the changes they were making called for them to obtain a conditional use permit. The plan they submitted to the town included accessing their property from Tepper Drive instead of Norman Drive. This meant building a new driveway from Tepper Drive, including cutting a gap through the hill between Tepper Drive and the house, and addressing resulting erosion issues.

The Zilvitises were concerned about the development on the Bruno lot and initially communicated objections to the permit to a town official. In a chance encounter between the Brunos and the Zilvitises a few days before the town hearing on the plan, Mr. Bruno told the Zilvitises that they were changing their access route and would no longer be using Norman Drive as the access. The Zilvitises were pleased to hear this as it alleviated their concerns about the effect of changes on their own property. The cottages were fairly close to each other and very visible to each other, and any change in use of Norman Drive affected the Zilvitis property.

The Zilvitises withdrew their objections, but continued to follow the issue and attended a DRB site visit and hearing on July 13, 2004. At both, the Brunos' representative Mr. Walsh described the project as providing for a single new access route off Tepper Drive. A site plan submitted also showed this. Mr. Zilvitis testified that at the DRB hearing, when Mr. Walsh told the DRB that the Brunos would no longer physically use Norman Drive, he also said that they would "probably not take it out of the deed." Mr. Walsh testified that at the DRB hearing, he stated on behalf

of the Brunos that they would probably give up physical use of Norman Drive, but that he "didn't know about the legal side of it."

In 2005, construction began, and started with the construction of the new driveway off Tepper Drive. The Brunos were told, and agreed, that their construction vehicles could not come through Norman Drive. The Zilvitises blocked off Norman Drive at the common property line by placing potted plants and colored tape on stakes across Norman Drive where it entered the Bruno property from their property.

At a hearing following construction in 2006 in connection with obtaining a certificate of occupancy, the Brunos' representative told the town officials that the Brunos would no longer be using Norman Drive as their route of access. In the fall of 2007, the Zilvitises further blocked off the Brunos' access over Norman Drive by planting bushes and constructing a stockade type fence on the common property line across the entire width of Norman Drive where it historically entered the Bruno property.

In this suit, the Brunos seek a declaration of a right of access to their property over Norman Drive and an injunction against the blocking of that right by the bushes and fence erected by the Zilvitises. The Brunos originally claimed a right over Norman Drive on two bases: a deeded right of way based on the 1953 deed, and a prescriptive easement based on use since 1976. In a summary judgment decision issued on December 31, 2012, the Court ruled that the Brunos have no deeded right to use Norman Drive. At trial, the Brunos sought to prove a prescriptive easement.

The Zilvitises claim that the Brunos' prior use of Norman Drive was on the basis of an easement by necessity, which has now ceased, and that the Brunos have not proved a date of termination of the easement by necessity plus prescriptive use thereafter for the required 15 years. They also claim that if the Brunos ever had an easement over Norman Drive, it has been extinguished by waiver or abandonment based on the Brunos' statements at town hearings that they were no longer going to use Norman Drive as the access to their property.

Apparently the Brunos are required to use Tepper Drive as their access in order to be in compliance with town regulatory requirements. They claim that nonetheless they still have a legal right of access over Norman Drive and they would like to maintain that route as a secondary access point.

6

**Conclusions of Law**

*Plaintiffs' Claim of a Prescriptive Easement*

The southern portion of the Bruno property was first created in 1946 by a deed that provided no right of access to a town road. At that point, an easement by necessity to that parcel came into existence. It is unknown exactly when Norman Drive began to be used to access that parcel, but by the time of the Buxton-Rand deed in 1952, there was a cottage on the parcel and it was accessed over Norman Drive. It is reasonable to infer that the location of the easement by necessity was at the current location of Norman Drive from the time of the creation of the easement in 1946.

As of July 15, 1953, as a result of the Lael Sargent to Rand deed of the northern portion of the Bruno property (Book 45, Page 548), which included a legal right of way over "the roadway" of Tepper Drive, the Rands merged two parcels into a single property with legal access over Tepper Drive. This extinguished the right of access that had been created by necessity, because necessity no longer existed, since there was then a deeded easement giving right of access to the Rand property. *Berge v State,* 2006 VT 116, ¶ 6, 181 Vt. 1 (citing *Traders, Inc. v Bartholomew,* 142 Vt. 486, 493 (1983)). Thus, the Rands no longer had any legal right to use Norman Drive to get to their property.

On July 24, 1953, Lael Sargent purported to grant to the Rands a legal right of access to their property over Norman Drive, but she had no authority to convey any property interest whatsoever, so the deed had no legal effect. While it did not convey an actual property interest, as a deed purporting to convey a right, it created a "color of title" basis on which the Rands claimed a right to use Norman Drive. Their actual use, however, was open, notorious, and hostile to the fee owners' interest.

The Rands and their successors used Norman Drive to access the Rand (now Bruno) property continuously from 1953 until the Bruno reconstruction project in 2005. The Brunos themselves used it continuously in an open, notorious, and hostile manner, and without permission of any kind, and as their sole point of access to their cottage, and on a year-round basis, from the time they purchased in 1976 until they began reconstruction in 2005. Thus the Plaintiffs have met their burden of proving that as of 1991, 15 years after their purchase, they had acquired an easement to use Norman Drive to cross the Zilvitis property to access their property on a year-round basis.

The Zilvitises argue that Plaintiffs have not met their burden to prove the termination of the period of necessity because in the course of discovery, and in connection with a prior summary judgment motion, the Plaintiffs' surveyor, Mr. Stein, gave the opinion that the July 15, 1953 deed of Lael Sargent to Rand at Book

7

45, Page 548 gave a right of way over Norman Drive and not Tepper Drive. Defendants argue that because this was Plaintiff's position until the time of trial, Plaintiffs cannot now switch arguments and claim to have proved that this deed gave a deeded legal right of way over Tepper Drive, thus ending any right of way of necessity.

The Court rejects Defendants' argument on this point for two reasons. First, when Mr. Stein testified at trial that Book 45, Page 548 gave the Brunos' predecessors a right of way over Tepper Drive and not Norman Drive, and it was clear that this was the first time the Defendants learned of this change in his opinion, the Court recessed the trial to give Defendants' counsel the opportunity to question Mr. Stein further on the issue. Defendants' counsel did so, and then proceeded with the trial. There was no request to continue the trial to provide more opportunity for adjusting to this change from what Defendants knew about Plaintiffs' evidence from discovery information or affidavits previously provided.

More importantly, the significant evidence by which the burden of proof is met by the Plaintiffs is the deed itself, and its language, together with the substantive content of all the other deeds involved in the history of property conveyances in the area and admitted into evidence together with the testimony of Doris Eddy and Frederick Moss, not Mr. Stein's interpretation of the meaning of the reference in the deed to "the roadway." All this evidence, without Mr. Stein's opinion, was well known to the parties, and when the deeds are read in sequence and mapped out on paper, as in the attachments to this decision, it is clear that the effect of the deed is to create a deeded right of way to the merged Rand parcel in 1953. This deeded right of way operated to extinguish the previous right of way of necessity over Norman Drive as a matter of law. The circumstance that Mr. Stein changed his opinion about the meaning of a roadway reference in the deed simply has the effect of discrediting his expertise and the value of his testimony on that point. It does not eliminate the fact that Plaintiffs put into evidence a deed and other evidence that showed that the deed had the effect of extinguishing a previous easement by necessity. Plaintiffs met their burden of proof, and Defendants do not have a basis for claiming a sanction of precluding consideration of the effect of the deed.

*Defendants' Claim of Equitable Estoppel or Abandonment*

Defendants claim that when the Brunos' agent spoke at two different public hearings and stated that the Brunos would no longer use Norman Drive as the means of accessing their reconstructed property, and when they told the Zilvitises the same thing during a chance personal encounter, that the effect was estoppel or abandonment of any prescriptive right to use Norman Drive that they may have acquired.

8

Equitable estoppel does not properly apply in the circumstances of this case. Equitable estoppel has four elements: "first, the party to be estopped must know the facts; second, the party being estopped must intend that his conduct shall be acted upon or the acts must be such that the party asserting the estoppel has a right to believe it is so intended; third, the latter must be ignorant of the true facts; and finally, the party asserting the estoppel must rely on the conduct of the party to be estopped to his detriment." *Fisher v. Poole*, 142 Vt. 162, 168 (1982); see also Restatement (Third) of Property: Servitudes § 7.6 (explaining by reference to § 2.9 that equitable estoppel may operate to terminate a servitude and is an exception to the statute of frauds).

Defendants claim that they gave up their challenge to Plaintiffs' zoning application based on the Brunos' statements that they would not be using Norman Drive for access. At a bare minimum, this is insufficient to show detrimental reliance or that any injustice would result from recognizing the existence of the easement. Plaintiffs constructed the Tepper Drive access and became bound by their conditional use permit to access their property from it. The purpose of allowing equitable estoppel to terminate a servitude is to prevent "the injustice and unjust enrichment that would result if servitude beneficiaries were able to mislead a burdened party into believing that the servitude will be modified or terminated and then to obtain an injunction or judgment for damages when the burdened party violates the servitude." Restatement (Third) of Property: Servitudes § 7.6 cmt. a. Defendants do not claim to have done anything with regard to their property based on Plaintiffs' representations other than to block Plaintiffs from using the access. Recognizing the easement merely maintains the status quo; it does not create any inequity. There is no basis for equitable estoppel.

Otherwise, as a general matter, the statute of frauds requires a writing. 12 V.S.A. § 181(5). Once a prescriptive easement has ripened into existence, it is a property interest that can only be conveyed as any other property interest. *Roy v. Woodstock Community Trust, Inc.*, 2013 VT 100A, ¶ 35 (explaining, in the context of an adverse possession claim, that once the prescriptive period has run the title acquired is "as perfect as acquisition by grant" (quoting *Montgomery v. Branon*, 127 Vt. 83, 89–90 (1968))).

Defendants argue that Plaintiffs in this case abandoned their access easement in the same way as the plaintiff in *Schonbek v. Chase,* 2010 VT 91, 189 Vt. 79. While the Plaintiffs in this case stopped using Norman Drive as their primary access point in 2005 when they created their new driveway off Tepper Drive, they did not engage in the kind of concrete action to permanently cut off all future use that was involved in *Schonbek.* Nonuse of a property interest does not by itself show an intent to abandon all use of it. *Id.* ¶ 13. The statements made by the Brunos in casual conversation about their intent, and the statements made by their agents before the DRB, were statements about intent with respect to a primary driveway for access to their redeveloped lot, but did not constitute action that "conclusively and

9

unequivocally" manifested an intent to *abandon* their easement over Norman Drive. *Id.*

The statements showed an intent to cease using it in favor of using an alternative access route, but that is not the same as intending to abandon it forever for all purposes. For example, the Brunos and their predecessors and neighbors had used Norman Drive consistently over time to walk to each other's properties for visits. Such use is likely to be consistent with whatever limitations exist in the town's conditional use permit. The statements by the Brunos and their agents do not show conclusively and unequivocally that they intended to abandon the easement for such a use. Defendants have not proved that the Plaintiffs abandoned all uses of their easement to use Norman Drive for access to their property. Mr. Zilvitis acknowledges that the statement made at the DRB on the Brunos' behalf did not go that far, as Mr. Walsh made no representation that the legal right would be given up, and even suggested that the easement would probably *not* be 'taken out of the deed.'

Defendants suggest that because the Brunos are required by the terms of the plan that was approved by the town for their project to use Tepper Drive as their access, they have abandoned their easement right to use Norman Drive. This is not the case. It may well be that if they attempt to access their property through Norman Drive, instead of or in addition to Tepper Drive, they will face regulatory enforcement action from the town. If so, that is entirely a matter for the town. It does not mean that a legal right does not exist, but only that they are limited in the manner in which they may use it.

For example, a property owner may have significant frontage on a public road, meaning that the owner can legally access the public road at any point on the frontage, but be limited by regulations relating to curb cuts to a single point of access or other regulations restricting land use. Many types of land use restrictions limit what an owner can actually do with property, despite having legal interests that would otherwise allow greater uses. This situation is no different. It is not up to this Court in this case to enforce municipal land use regulations by terminating property interests otherwise lawfully established and held. Regulatory enforcement is a matter for the relevant agency.

The Court saw the fence on the view that was taken, and the fence restricts all possible movement on Norman Drive to the Bruno property, including pedestrian traffic. This is an interference with the legal easement right that Plaintiffs have proved for access to their property over Norman Drive across the Zilvitis property. There may be some uses of the easement that are in compliance with the Brunos' permit and regulatory requirements. That is for another body, and not this Court at this time, to determine. Plaintiffs have proved their right to a declaration of a legal right of access over Norman Drive based on a prescriptive easement.

10

*Injunction*

Defendants argue that the Court should balance the equities of the parties and decline to issue an injunction. However, any remedy other than an injunction would deprive the Plaintiffs of actual use of a property interest they hold. Plaintiffs are entitled to an injunction against continuation of the fence and plantings and other obstructions that prohibit their use of the easement they hold to use Norman Drive to access their property.

**Order**

Plaintiffs' counsel shall prepare a Declaratory Judgment and Injunction consistent with these Findings and Conclusions. Defendants shall have five days to file any objections to form.

Dated  this 27th day of September 2014.

_____
Hon. Mary Miles Teachout
Superior Judge